UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JOHN PIZZUTI,

      Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

19-CV-411
DECISION & ORDER

---

On March 28, 2019, the plaintiff, John Pizzuti, brought this action under the Social Security Act. He seeks review of the determination by the Commissioner of Social Security ("Commissioner") that he was not disabled. Docket Item 1. On October 15, 2019, Pizzuti moved for judgment on the pleadings, Docket Item 12; on January 21, 2020, the Commissioner responded and cross-moved for judgment on the pleadings, Docket Item 16; and on February 11, 2020, Pizzuti replied, Docket Item 17.

For the reasons stated below, the Court denies Pizzuti's motion and grants the Commissioner's cross-motion.[1]

## **STANDARD OF REVIEW**

"The scope of review of a disability determination . . . involves two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). The court "must first decide whether [the Commissioner] applied the correct legal principles in making the

---

[1] This Court assumes familiarity with the underlying facts, the procedural history, and the ALJ's decision and will refer only to the facts necessary to explain its decision.

determination." *Id.* This includes ensuring "that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Social Security Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). Then, the court "decide[s] whether the determination is supported by 'substantial evidence.'" *Johnson*, 817 F.2d at 985 (quoting 42 U.S.C. § 405(g)). "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles." *Johnson*, 817 F.2d at 986.

## DISCUSSION

Pizzuti argues that the ALJ erred in two ways. Docket Item 12-1. First, he argues that the ALJ's determination of his physical residual functional capacity ("RFC") was not supported by substantial evidence because it was based on a stale medical opinion and the ALJ's lay interpretation of complex medical findings. *Id.* at 14-19. Second, he argues that the ALJ's determination of his mental RFC was not supported by substantial evidence because the ALJ failed to explain why he rejected specific portions of an opinion from Pizzuti's treating psychiatrist. *Id.* at 19-22. The Court disagrees with both arguments and accordingly affirms the Commissioner's determination.

I.  PHYSICAL RFC

    A.  **Stale opinion**

"A stale medical opinion does not constitute substantial evidence to support an ALJ's findings." *Majdandzic v. Comm'r of Soc. Sec.*, 2018 WL 5112273, at *3 (W.D.N.Y. Oct. 19, 2018).  But a "gap of time between when an opinion is rendered and the disability hearing and decision does not automatically invalidate that opinion." *Id.*  For a medical opinion to be stale, not only must there be a significant period of time between the date of the opinion and the hearing date, there also must be subsequent treatment notes "indicat[ing] a claimant's condition has deteriorated" over that period.  *Whitehurst v. Berryhill*, 2018 WL 3868721, at *4, *5 (W.D.N.Y. Aug. 14, 2018).  In other words, the "mere passage of time does not render an opinion stale," *id.*, but "significant developments" in an individual's medical history after the examination might.  *Davis v. Berryhill*, 2018 WL 1250019, at *3 (W.D.N.Y. Mar. 11, 2018).

Here, the ALJ gave "some" weight to the May 2015 opinion of a consulting physician, thoracic surgeon Samuel Balderman, M.D.  Docket Item 6 at 27-28.  Dr. Balderman had opined in May 2015 that Pizzuti had "mild limitations with repetitive bending and lifting." *Id.* at 692.  Although the ALJ found that Dr. Balderman's "definition of 'mild limitations' [was] not clear," he nevertheless found Dr. Balderman's conclusions to be "generally consistent with medical evidence of record." *Id.* at 27-28.

Pizzuti argues that because Dr. Balderman examined him before he fell down a flight of stairs and further injured himself in June 2015, Dr. Balderman's May 2015 opinion was stale.  Docket Item 12-1 at 15-16; *see also* Docket Item 6 at 696 (treatment note from Alanna Castaldo, R.P.A.-C., reporting Pizzuti's fall).  But Pizzuti has not shown that the fall was a "significant development[ ]" in his medical history.  *See Davis*,

3

2018 WL 1250019, at *3.  On the contrary, he points to issues that predate Dr. Balderman's examination.

For example, Pizzuti argues that it was only after the fall that he began having "radiating" neck pain.  Docket Item 12-1 at 15-16.  But Pizzuti had seen pain management specialist Jafar Siddiqui, M.D., in mid-2013 with complaints of neck and back pain, and in 2014 he received epidural steroid injections as well as a medial branch block to help relieve that pain.  Docket Item 6 at 983, 638-43.  What is more, to the extent the June 2015 fall may have exacerbated any existing neck issues, that deterioration was only temporary.  Three months after the fall, neurosurgeon Leonard Kaplan, D.O., observed a 25% restriction in motion in Pizzuti's neck and lumbar spine.  Docket Item 6 at 854.  But by early 2017, neurosurgeon John Fahrbach, M.D., found that Pizzuti had intact neck range of motion and full strength.  *Id.* at 1062.  Dr. Fahrbach did not recommend surgery; instead, he suggested that Pizzuti continue with pain management treatment, including injections—the very same treatment Pizzuti was receiving at the time of Dr. Balderman's examination.  *See id.* at 1060.

As for Pizzuti's complaints of greater lower back pain following the fall, the record again lacks evidence showing that Pizzuti's condition significantly deteriorated after Dr. Balderman rendered his opinion.  For example, although Dr. Kaplan found in September 2015 that Pizzuti's range of motion in his lower back was somewhat restricted, similar findings had been noted in a November 2014 examination.  *Id.* at 631, 854.  Dr. Kaplan also found that there "were no significant interval changes" between July 2013 and August 2015 MRIs of Pizzuti's cervical and lumbar spine.  *See id.* at 849, 853.

In short, because "the record indicates no meaningful deterioration following [Dr. Balderman's] examination," Dr. Balderman's opinion was not stale when the ALJ rendered his opinion. *See Whitehurst*, 2018 WL 3868721, at *4. As such, the ALJ was not required to obtain a new medical source statement and, instead, was permitted to rely on Dr. Balderman's opinion in determining Pizzuiti's RFC.

### B. Lay Opinion and the Duty to Develop the Record

Pizzuti argues that the physical RFC also is not supported by substantial evidence because Dr. Balderman's opinion was silent on essential functions of light work other than bending and lifting. Docket Item 12-1 at 16. Because the ALJ did not give weight to any other medical opinion addressing Pizzuti's physical impairments, Pizzuti argues that "it logically follows the ALJ must have [impermissibly] relied on his lay interpretation of the bare medical findings to make his RFC finding." *Id.* at 17. This Court again disagrees.

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 686 F.2d 751, 755 (2d Cir. 1982)); *see also Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (same); 42 U.S.C. § 423(d)(5)(B) (requiring that the Commissioner, before rendering any eligibility determination, "make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make such determination"). Thus, "where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is

5

represented by counsel or . . . by a paralegal.'" *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (quoting *Perez*, 77 F.3d at 47)).  On the other hand, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."  *Id.* at 79 n.5 (quoting *Perez*, 77 F.3d at 48)).

The Commissioner's own regulations reflect this duty, stating that "[b]efore [the Commissioner] make[s] a determination that [a claimant is] not disabled, [the Commissioner] will develop [the claimant's] complete medical history . . . [and] will make every reasonable effort to help [the claimant] get medical reports from [her] own medical sources when [she] give[s] [the Commissioner] permission to request the reports."  20 C.F.R. § 404.1512(d)(1).  Those regulations further explain that when a claimant is receiving or has received ongoing treatment from a qualified medical professional, the Commissioner "will request a medical source statement [from the claimant's treating source] about what [the claimant] can still do despite [her] impairment(s)."  *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) (summary order) (quoting former 20 C.F.R. § 416.913(b)(6)[2]) (additional citation omitted).  That is so because the opinions of treating sources—physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists who have "ongoing treatment relationship[s]" with claimants and therefore are most able to "provide . . . detailed, longitudinal picture[s] of [claimants'] medical impairments"—are entitled to "controlling weight" so

---

[2] This section was amended, effective March 27, 2017.  Revisions to the Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 5844, 5875 (Jan. 18, 2017).  Because Pizzuti applied for disability benefits starting in February 2013—that is, before the date the changes became effective—his claim is governed by the prior regulation.  *See id.* at 5844-46.

long as they are "well-supported [sic] by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the claimant's] case record."[3]  *See* 20 C.F.R. §§ 416.913(a) (2015), 416.927(c)(2) (2015); *see also Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) (summary order).

The Second Circuit has observed that the "plain text" of section 416.913(b)(6) "does not appear to be conditional or hortatory:  it states that the Commissioner '*will* request a medical source statement' containing an opinion regarding the claimant's residual capacity.  The regulation thus seems to impose on the ALJ a duty to solicit such medical opinions."  *Tankisi*, 521 F. App'x at 33 (emphasis in original) (quoting former 20 C.F.R. § 416.913(b)(6)) (additional citation omitted).  Nevertheless, "remand is not always required when an ALJ fails in his duty to request [medical source] opinions [from treating sources], particularly where . . . the record contains sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity."  *See id.* at 34.  That is the case here.

Dr. Balderman, a thoracic surgeon, conducted a full-body examination of Pizzuti before rendering his opinion that Pizzuti had "mild limitations with repetitive bending and lifting."  Docket Item 6 at 692.  That opinion was based on his findings that Pizzuti

---

[3] Indeed, an ALJ may not give a treating source's opinion anything less than controlling weight unless he first "explicitly consider[s], *inter alia*:  (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and[ ] (4) whether the physician is a specialist."  *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quotations and alterations omitted).  "An ALJ's failure to 'explicitly' apply [these] factors [before] assigning [less-than-controlling] weight" to a treating source opinion "is a procedural error."  *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019) (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam)).

walked with a normal gait and had full range of motion and strength in the cervical spine, shoulders, elbows, forearms, and wrists, and somewhat reduced motion in the lumbar spine.  *Id.* at 690-91.  Although Pizzuti correctly observes that Dr. Balderman did not comment on his ability to sit, stand, walk, carry, push, pull, reach, handle, or tolerate environmental conditions, Pizzuti does not point to any treatment notes suggesting limitations in these areas.  *See* Docket Item 12-1 at 16-18; *see also Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) ("The claimant bears the ultimate burden of proving [disability] throughout the period for which benefits are sought." (citation omitted)).  And, as discussed above, notes from Pizzuti's treating providers did not show limitations beyond those in Dr. Balderman's opinion.

In other words, even assuming that the ALJ erred in relying on an opinion from a consulting physician that lacked a full function-by-function analysis, that error would not require remand because there is no evidence from Pizzuti's treating sources that he in fact had limitations in any of the unaddressed functional areas.  Indeed, to the extent the ALJ might have deviated from the opinion of Dr. Balderman, he did so to Pizzuti's benefit, limiting him to light work[4] and adding that he must avoid exposure to extreme cold, excessive and loud noise, bright lights, and irritants.  Docket Item 6 at 25.  Pizzuti can hardly be heard to complain that the ALJ imposed additional restrictions on his physical functioning beyond those identified in a competent medical opinion.

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 416.967(b).

In sum, the ALJ neither failed to fill a meaningful gap in the record nor impermissibly substituted his own lay judgment for that of competent medical opinion. *See Pritchett v. Berryhill*, 2018 WL 3045096, at *7 (W.D.N.Y. June 20, 2018) ("Ultimately, the duty to re-contact does not arise unless the record is insufficient for the ALJ to determine whether a claimant is disabled."); *Ayers v. Astrue*, 2009 WL 4571840, at *2 (W.D.N.Y. Dec. 7, 2009).  Remand therefore is not required on either basis.

## II.     MENTAL RFC

Pizzuti also argues that the ALJ erred in determining his mental RFC because the ALJ did not adequately explain his reasons for rejecting specific portions of an opinion from Pizzuti's treating psychiatrist.  *See* Docket Item 12-1 at 19-22.  The Court disagrees.

An ALJ generally is not required to "reconcile explicitly every conflicting shred of medical testimony," *Dioguardi v. Comm'r of Soc. Sec.*, 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006) (internal citation omitted), and "[t]here is no absolute bar to crediting only portions of medical source opinions," *Younes v. Colvin*, 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015).  But when the "RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Dioguardi*, 445 F. Supp. 2d at 297 (quoting S.S.R. 96-8p, 1996 WL 374184, at *7 (S.S.A. July 2, 1996)).  And when an ALJ adopts only parts of a medical opinion, he must explain why the other parts were rejected.  *Raymer v. Colvin*, 2015 WL 5032669, at *5 (W.D.N.Y. Aug. 25, 2015) ("[A]n ALJ who chooses to adopt only portions of a medical opinion must explain his or her decision to reject the remaining portion.").  The "explanation need not be exhaustive:  it is enough if the Court can 'glean the rationale of

9

an ALJ's decision.'" *Chance v. Comm'r of Soc. Sec.*, 2019 WL 2123565, at \*6 (W.D.N.Y. May 15, 2019) (quoting *Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)).

Here, Pizzuti argues that the ALJ's mental RFC was inconsistent with the opinion of his treating psychiatrist, TeeJay Tripp, D.O., to which the ALJ gave "great weight." Docket Item 12-1 at 19. More specifically, Pizzuti argues that the ALJ erred by not including a limitation reflecting Dr. Tripp's assessment that Pizzuti had only a "fair" capacity to work without supervision. *Id.* at 20.

But contrary to Pizzuti's argument, Dr. Tripp's opinion was not inconsistent with the mental RFC. On a standard form supplied by the State of Oklahoma Disability Determination Division, Dr. Tripp assessed whether Pizzuti's capacity to perform various activities was "unlimited," "good," "fair," or "poor." Docket Item 6 at 382-383. "[F]air" was defined as follows: "[t]he evidence supports the conclusion that the individual's capacity to perform the activity is impaired, but the degree/extent of the impairment needs to be further described." *Id.* at 382. The form provided space to elaborate as to what findings supported the assessment, and in opining that Pizzuti's ability to work without supervision was "fair," Dr. Tripp stated that "[Pizzuti] ha[d] impaired concentration which limit[ed] ability to work and carry out tasks." *Id.*

In fact, the RFC reflects this limitation: the ALJ limited Pizzuti to "simple, routine, and repetitive tasks . . . in a low stress job, defined as having no fixed production quotas, no hazardous conditions and only occasional decision making required, [and] only occasional changes in the work setting." *Id.* at 25. These RFC limitations, especially the limit of only occasional decision making, adequately accounted for

10

Pizzuti's "fair" limitations in performing unsupervised work.  The RFC also was consistent with the opinion of the consulting psychologist, Janine Ippolito, Psy. D., that Pizzuti could "maintain attention and concentration and relate adequately with others with mild limitations."  See Docket Item 6 at 684-88.

In sum, the ALJ's decision permits the Court to glean the rationale behind Pizzuti's mental RFC.  See Chance, 2019 WL 2123565, at *6.  Because the Court understands the ALJ's rationale, and because that rationale is supported by substantial evidence including Dr. Tripp's and Dr. Ippolito's opinions, remand is not required.

## **CONCLUSION**

Although this Court has sympathy for Pizzuti and the hardships that must stem from the impairments he experiences, the ALJ's decision neither was contrary to the substantial evidence in the record nor resulted from any legal error.  Therefore, for the reasons stated above, Pizzuti's motion for judgment on the pleadings, Docket Item 12, is DENIED; the Commissioner's cross motion for judgment on the pleadings, Docket Item 16, is GRANTED; the complaint is DISMISSED; and the Clerk of Court shall close the case.

SO ORDERED.

Dated:	August 14, 2020
	Buffalo, New York

	*/s/ Hon. Lawrence J. Vilardo*
	LAWRENCE J. VILARDO
	UNITED STATES DISTRICT JUDGE